ALEXANDER, Adm'r of Estate OF EVELYN
VIRGINIA ALEXANDER, etc. *v.* BOYER

[No. 181, September Term, 1968.]
*Decided May 14, 1969.*

*Motion for rehearing filed June 5, 1969; denied June 23, 1969.*

The cause was argued before HAMMOND, C. J., MARBURY, BARNES, SINGLEY and SMITH, JJ.

*William E. Gallagher, Jr.,* with whom was *J. Hodge Smith* on the brief, for appellant.

*Charles C. W. Atwater,* with whom were *David A. Carney, Dwight C. Stone* and *Murray H. Fout* on the brief, for appellee.

BARNES, J., delivered the opinion of the Court.

The principal question presented by this appeal is whether or not a joint tenancy in approximately 85 acres of farm land in Frederick County had been destroyed so that the joint own-ers held the land by a tenancy in common rather than by a joint tenancy with the right of survivorship.

The facts are not in dispute and are included in a stipulation of the parties.

On February 27, 1945, Emery D. Lease, a widower (Emery), conveyed his farm in Frederick County, containing approximately 117 acres of land, together with all livestock, farming implements and personal property located on the farm to a straw man, who immediately thereafter conveyed the farm, together with all livestock, farming implements and personal property located on it to Emery B. Lease, Helen M. Boyer (Helen) and Evelyn V. Lease (Evelyn) his daughters "as joint tenants and to the survivor of them, and not as tenants in common, their heirs and assigns forever, in fee simple." The conveyances were duly recorded. Helen, at that time was married to Mehrl T. Boyer (Mehrl) who was plaintiff below in his capacity as executor and sole devisee under Helen's will. Evelyn, the other daughter and one of the three joint tenants, was unmarried at that time.

On May 21, 1947, Emery, widower, Helen and Mehrl, her husband, and Evelyn, unmarried, conveyed certain lots from the farm and on May 4, 1953, they conveyed away two additional parcels containing 10 acres and 7.577 acres, respectively. Thereafter they subjected portions of the remaining land to easements in favor of the United States of America, the Potomac Edison Company and the Chesapeake and Potomac Telephone Company. On February 8, 1958, they conveyed 11.44 acres of the remaining land to the State Roads Commission. All of the money received from these transactions was deposited in the joint names of Emery, Helen and Evelyn in the local banks in joint accounts.

Evelyn married Edwin M. Alexander (Edwin) on July 3, 1960. Edwin was the respondent in the lower court in his capacity as administrator of Evelyn, as her surviving husband and her only heir at law. He is the appellee in this Court. Shortly after Evelyn's marriage to Edwin, the joint bank accounts containing the proceeds from the real estate transactions, were withdrawn and divided equally between Emery, Helen and Evelyn.

Emery died on October 9, 1961, a widower and intestate, leaving Helen and Evelyn as his only heirs at law and next of kin. The following January 8, 1962, Evelyn sold her right, title and

interest in the items of farm equipment (26 separate items) the Holstein bull, three Holstein heifers and 21 milk cows located on the farm, "Emery Lease Farm," to Mehrl for $3,601.50. On the same day, she executed a written lease under seal of all of her right, title and interest in the "Emery Lease Farm" and containing 98 acres of land, more or less for a term beginning January 1, 1962 and ending March 31, 1963, for a monthly rental of $100, with provisions that Mehrl, as the tenant, should pay all taxes, assessments and charges accruing during the term, keep the premises insured to the extent of the present fire policies and pay all premiums thereon, maintain the premises in the present condition and yield up the premises to Evelyn, the lessor, "at the end of the original tenancy or any renewal or renewals thereof." The lease further stated that it was "understood and agreed between the parties hereto that the Lessor is to receive the rent of One Hundred Dollars ($100.00) per month without any deductions from any cause or nature whatsoever." On January 1, 1963, Mehrl, the tenant, sublet his interest in the lease of January 8, 1962, to Spencer Ralph Loy and wife from that date to March 31, 1963.

Thereafter, Helen and Mehrl, her husband, and Evelyn and Edwin, her husband, leased the farm to Loy and wife for a period of one year beginning April 1, 1963, and ending March 31, 1964, and renewable thereafter until either the lessors or the lessees should terminate it by giving six months notice in writing. Mehrl collected all monthly rentals and deposited one-half of the rent in a joint account in the name of himself and his wife, Helen, and paid the remaining one-half to Evelyn. This lease was renewed and was in effect when the bill of complaint was filed in this case in the Circuit Court for Frederick County on June 21, 1967.

On October 18, 1963, Helen and Mehrl, her husband, and Evelyn and Edwin, her husband, conveyed two acres of land to the Eastern District of Christian and Missionary Alliance, Inc., together with an option to purchase an additional one-half acre, this option being in effect when the bill of complaint was filed. In the deed of October 18, 1963, it was provided that the option would expire upon the happening of any one of the following conditions:

"(1) Failure of the optionees to exercise same in writing within 30 days after notice to them of the execution of a contract of sale by the grantors herein, *or the survivor thereof,* for the remainder of the whole farm of which the one-half acre lot is a part; or (2) Failure of the optionees to exercise same in writing within 30 days after notice to them by administrator or executor, as the case may be, of the estate of the last surviving *joint tenant grantor* herein; or (3) By notice in writing to said joint tenants, or the survivor, at any time hereafter by the optionees or either of them, that the option herein granted will not be exercised, which said notice of refusal shall be in a form permitting its recording among the Land Records of Frederick County, if necessary." (Emphasis supplied)

The selling price for this conveyance and option was divided equally between Helen and Evelyn.

On February 4, 1965, Helen and Mehrl, her husband, and Evelyn and Edwin, her husband, entered into an agreement to sell the remaining 85 acres of the farm to Dr. Sol Levine, contingent upon his obtention of rezoning of the land for the erection of townhouses. Dr. Levine made a payment of $5,000 when the agreement was executed which was held by the realtors pending certain contingencies set forth in the agreement. The agreement provided that the purchase price should be $6,000 an acre, the acreage to be determined by a survey obtained at the buyer's expense, and should be paid as follows: 29% "is to be paid to the sellers by the buyer at the time of settlement. Buyer is to give the sellers a purchase money mortgage for the balance of said purchase price, to bear interest at the rate" of 4½% per annum, the principal to be payable in 10 equal installments. The buyer agreed to file the application for the rezoning (R-4) promptly and to pursue the rezoning "in a reasonable and expeditious manner", all costs being at the buyer's expense, but the sellers agreed to sign the necessary applications as owners. The agreement then provided:

"If said buyer is unable to obtain the required zoning for the entire tract, the buyer, at his option, may

within thirty (30) days of the completion of the re-zoning application, purchase the entire tract at the aforementioned Six Thousand Dollars ($6,000.00) per acre, or to declare the option contract void. It is further agreed that the deposit herein mentioned shall be forfeited by the buyer in the event that the necessary zoning applications are not promptly filed or pursued by him in a reasonably expeditious manner. If said zoning application is promptly filed and pursued by the buyer in a reasonably expeditious manner but is not granted for apartment and Towne House uses, the said Five Thousand Dollar ($5,000.00) deposit will be returned to the purchaser."

It was further provided that if rezoning were approved and the buyer exercised his option to purchase, the sellers, as mortgagees would release land on the basis of $8,000 an acre upon certain conditions; that settlement would be 30 days from the exercise of the option or within 60 days of the granting of the rezoning "whichever shall first occur"; and, that time was of the essence of the contract.

Dr. Levine elected not to purchase on March 17, 1967, and as a result of ensuing litigation, the Circuit Court for Frederick County (Equity No. 21,007) filed an opinion and an order dated October 27, 1966, determining that Dr. Levine was not entitled to a return of his $5,000 payment which, in the meantime, had been paid over by the realtors to the attorney for the sellers, and was by him, less his fee, paid over to Edwin. While Equity No. 21,007 was pending, Helen died on July 7, 1966, leaving a will naming Mehrl, her surviving husband, as executor and as sole devisee. After Helen's death, Evelyn demanded and received from the Loys, tenants of the farm, all monthly rental until she died on May 16, 1967, intestate, leaving her surviving husband Edwin as her only heir at law. Edwin was duly appointed as administrator of Evelyn's estate. After Evelyn's death, Edwin demanded and received the monthly rental of the farm from the Loys.

Mehrl filed the bill of complaint in the present case on June 21, 1967, setting forth most of the above stated facts. Edwin

was named as defendant. Mehrl alleged that because of the facts alleged in his bill of complaint, the joint tenancy ownership of the property was terminated prior to the death of his wife Helen and that Mehrl owned a one-half interest in the land. The prayers for relief were that the Circuit Court declare, pursuant to the Uniform Declaratory Judgments Act, Code (1957), Article 31A, the title and ownership of the parties to the farm and that the plaintiff have other and further relief.

Edwin filed an answer claiming that none of the facts alleged is sufficient to change the joint tenancy to a tenancy in common and that he as heir of the last surviving joint tenant is entitled to the full and complete ownership in the farm, the rents and the net proceeds of the Levine payment.

After the stipulation of facts was filed and trial briefs and arguments were presented, the Chancellor (Clapp, J.) filed an opinion indicating that, in his opinion, the joint tenancy in the personal property had been terminated by the sale of January 8, 1962, by Evelyn and that the joint tenancy in the land had been terminated by the agreement of February 4, 1965 with Levine. He signed a decree on July 11, 1968, declaring that on July 7, 1966, the land was held in equal interest by Helen and Evelyn as tenants in common and not as joint tenants, that Edwin, administrator of Evelyn's estate, pay to Mehrl, executor of Helen's will, $1,540.13, representing one-half the gross rental less one-half of the expenditures accounting from July 7, 1966, to the date of the decree, the amount having been agreed upon by stipulation of the parties; that Edwin, administrator of Evelyn's estate, pay to Mehrl, executor of Helen's will, $1,500, representing one-half of the net amount of the Levine payment; that future net profits and losses from the land be divided equally between Mehrl and Edwin and that the costs be divided equally between them.

We shall affirm the Chancellor's decree but for a different reason so far as the termination of the joint tenancy of the land is concerned.

The estate of joint tenancy, with its right of survivorship or *jus accrescendi,* was well known at common law and during the time of feudalism, because of the vital importance of tenure, was a favored estate. Chancellor Kent, in 4 Kent's Commen-

taries (1896, Fourteenth Ed.) 361, gave the reason for the common law rule, as follows:

> "The common law favored title by joint tenancy, by reason of this very right of survivorship. Its policy was adverse to the division of tenures, because it tended to multiply the feudal services, and weaken the efficacy of that connection. [Citing Lord Chief Justice Holt in *Fisher v. Wigg*, 1 Salk, 391, in a note] But in *Hawes v. Hawes* [1 Wils. 165], Lord Hardwicke observed, that the reason for that policy had ceased with the abolition of tenures; and he thought, that even the courts of law were no longer inclined to favor them; and at any rate, they were not favored in equity, for they were a kind of estate that made no provision for posterity."

At common law it was presumed that a conveyance to two or more persons created a joint tenancy. *Hannan v. Towers*, 3 Har. & J. 147 (1810). This presumption was inverted by the passage by the General Assembly of Chapter 162 of the Acts of 1822, which now appears as Code (1957), Art. 50, § 9 (1968 Repl. Vol.) which provides that "No deed, devise or other instrument of writing should be construed to create an estate in joint tenancy, unless in such deed, devise or other instrument of writing it is expressly provided that the property thereby conveyed is to be held in joint tenancy." As Judge (now Chief Judge) Hammond stated, for the Court, in *Register of Wills for Montgomery County v. Madine*, 242 Md. 437, 445, 219 A. 2d 245, 250 (1966): "* * * joint tenancies are not favored either legislatively or judicially in Maryland * * *." This is also the law in most of the other States. See Note 1 in *Madine, supra*. See also *Williams v. Dovell*, 202 Md. 351, 358, 96 A. 2d 484, 488 (1953), and *Chew v. Chew*, 1 Md. 163, 171 (1851).

At common law "joint tenants were seised *'pur my et pur tout'*." 2 *American Law of Property*, § 6.1, at 3 (1952). In further comment upon this incident of joint tenancy, the following was stated:

> "When Bracton said that joint tenants were seised *pur my* as well as *pur tout*, he meant that while each

joint tenant was seised of the whole, nevertheless as between themselves and in their relations with persons other than the lord or their heirs, each joint tenant had an undivided interest as an individual which was equal to the interest of every other cotenant. Since they were seised together as a fictitious unity, there was necessarily a community of interest which required their individual interests be equal in all respects. The later books recite that four unities were essential to a joint tenancy, those of time, title, interest and possession. The requirement of the four unities expresses in an artificial way the basic idea that co-tenants hold as a unity with a community of interest between them, since if they take as one they must take at the same time, by the same deed or feoffment, and must have interests which are identical." (*Id.* § 6.1 at 4)

See also 2 Blackstone's Commentaries 180 (Lewis Ed. 1898) ; 2 Tiffany, *Real Property,* § 418 (3rd Ed. 1939).

In Maryland, joint tenancies are permitted and we have held that they have the same characteristics as they did at common law. In *Eder v. Rothamel,* 202 Md. 189, 95 A. 2d 860 (1953), Judge (now Chief Judge) Hammond stated, for the Court:

"Maryland by statute specifically permits joint tenancy—Article 50, Section 13 of the Code (1951 Ed.). The characteristics of a joint tenancy are its four unities ; that is to say, the unity of interest, unity of title, unity of time, and unity of possession. *Chew v. Chew,* 1 Md. 163; 2 *American Law of Property,* Sec. 6.2; and 2 *Tiffany, Real Property,* 3rd Ed. Section 425. These must coincide—if any is lacking, the estate cannot be one of joint tenancy. The destruction of one or more of the four unities severs and destroys the joint tenancy and this may be done by a conveyance, voluntary or involuntary, of the interest of one of the joint tenants. A joint tenant may convey his interest by deed, and the result is a severance of the joint tenancy and the creation of a tenancy in common between the grantee and the surviving joint tenant or tenants. 2

*Tiffany, Real Property,* 3rd Ed. Sec. 425; and 2 *American Law of Property,* Sec. 6.2. There may be a partition by decree of Court as between joint tenants. Article 16, Sec. 170 of the Code (1951 Ed.). The joint tenant may mortgage his interest. The joint tenancy will be destroyed by this conveyance. *Wolf v. Johnson,* 157 Md. 112, 145 A. 363; *McPherson v. Snowden,* 19 Md. 197; and 2 *American Law of Property,* Sec. 6.2." (202 Md. at 192, 95 A. 2d at 862)

There is no question in the present case that a valid joint tenancy in the farm as well as in the farm implements and cattle was created by the deed of February 27, 1945 from the straw man to Emery, Helen and Evelyn.

It is also clear from our decisions in *Eder* and *Madine* that a conveyance of an interest in property held in joint tenancy by one or more of the co-tenants will sever the joint tenancy and cause the share conveyed to become property held as tenants in common with the other co-tenants. The Chancellor correctly ruled that the conveyance by Evelyn of her interest in the farm equipment and cattle to Mehrl on January 8, 1962, resulted in a severance of the unities of title, interest and possession in them and resulted in a termination of the joint tenancy in that personal property.

The Chancellor, however, was of the opinion that the *lease* by Evelyn of her interest in the farm to Mehrl, also on January 8, 1962, did not result in a termination of the joint tenancy in the farm because in the deed of October 18, 1963, from Helen and Evelyn and their respective husbands to the Eastern District of Christian and Missionary Alliance, Inc., they described themselves as joint tenants and further provided for notice of the exercise of the option to the survivor of the two sisters or her estate. The Chancellor was of the opinion that the agreement of February 4, 1965, between the two sisters and their respective husbands, as sellers, and Dr. Levine was a sufficient contract by the "joint tenants" for the sale of the land to result in a termination of the joint tenancy under our decision in *Madine.* We do not agree with the Chancellor's opinion that the lease of January 8, 1962, did not terminate the joint ten-

ancy or that the agreement of February 4, 1965, could in itself, result in a termination of the joint tenancy if it had existed on the date of the agreement.

In regard to the agreement of February 4, 1965, as a termination of the joint tenancy in the farm, the Chancellor was of the opinion that our decision in *Madine* was controlling. In our opinion, however, the agreement in the present case is quite different from the agreement in *Madine*. In *Madine* both of the joint tenants had agreed with the State on the selling price for the jointly held real estate and had delivered a fully executed deed to the State in fee. Prior to recordation, one of the joint tenants died and it was contended that inasmuch as legal title had not passed because of the requirements of Code (1957), Art. 21, § 1 and § 12 that the deed be recorded, there had been no severance of any of the unities and there was no termination of the joint tenancy. We pointed out in *Madine* that in Maryland and in accordance with the law generally, a contract to convey will terminate a joint tenancy under circumstances in which a transfer of legal title would do so, so that the executed and delivered deed prior to recordation transferred the full equitable interest in the land (the grantor holding a bare legal title for the benefit of the State) and resulted in a termination of the joint tenancy. In the instant case, however, the agreement of February 4, 1965, was an *option contract* and until the conditions precedent were met and the option was exercised by Dr. Levine, no equitable interest or estate passed to Dr. Levine on which specific performance could be granted. See *Simpers v. Clark*, 239 Md. 395, 400-01, 211 A. 2d 753, 756 (1965). Possession of the land was not to be given until the time of settlement and there was no settlement inasmuch as the rezoning was never obtained and the option was never exercised by Dr. Levine, who, in fact, indicated that he would not exercise the option. Under these circumstances, the agreement of February 4, 1965, would not impair any of the four unities and would not result in a severance or termination of the joint tenancy.

We are of the opinion, however, that the lease of January 8, 1962, by Evelyn to Mehrl from January 1, 1962 to March 31, 1963 for $100 a month did result in a destruction of the unity of

interest. In 2 *American Law of Property,* § 6.2 at 10, it is stated:

> "There is an ancient controversy, going back to Coke and Littleton, as to whether or not a lease by one joint tenant severs the joint tenancy. It is clear that the lease of an undivided interest is valid, but it is not clear whether or not the reversion is subject to survivorship. Again, the better view would be that the severance is complete because of the severance of the unity of interest."

See also 3 Reeve's *History of English Law* 539 (Finlason Ed. 1880).

When Evelyn executed the lease to Mehrl on January 8, 1962, for a certain term, she conveyed her possessory rights in the land to him for that term, thereby changing the nature of her "interest" in the land from a *present* interest to a *reversionary* interest. The sub-lease from Mehrl to the Loys for three months of the term of the original lease emphasized the fact that Evelyn had parted with all of her possessory rights for the term of the lease. This destroyed the unities of interest and possession in the joint tenancy and terminated the joint tenancy.

In a comment in 25 Cal.L.Rev. 203 (1937), on the case of *Swartzbaugh v. Sampson,* 11 Cal.App.2d 451, 54 P. 2d 73 (1936), three possible theories in regard to the effect of a lease by one joint tenant upon the joint tenancy are considered. It was concluded:

> "In view of the apparent hostility of courts to estates in joint tenancy, however, the second theory holding that the making of the lease effects a complete and final severance, may be preferred. The attitude of hostility is supported by statute, by the fact that survivorship is a mere gamble, and by the harsh and unforeseen results emanating from such estates. Actually on the making of the lease, there is no longer a unity of estate; there is no unity of possession. It is submitted that these factors are sufficient to support a conclusion that a total severance results." (25 Cal.L.Rev. at 208)

We agree that the better view is that a lease does destroy one or more of the essential four unities and results in a severance and termination of the joint estate.

It is well settled that once the severance of the joint estate occurs, the joint tenants then become tenants in common and that a reconveyance of the portion of the estate conveyed does not re-establish the joint tenancy. See 2 *American Law of Property*, § 6.2 at 9, where it is stated:

> "At the common law a severance of any one of the unities would end the joint tenancy. Since a conveyance by a joint tenant severed the joint tenancy, so a common law mortgage, which transferred title to the mortgagee, severed the joint tenancy. A reconveyance of a moiety would not revive the joint tenancy, nor would the payment of the mortgage on the law day."

See also *Partridge v. Berliner*, 325 Ill. 253, 156 N. E. 352 (1927); *Szymczak v. Szymczak*, 306 Ill. 541, 138 N. E. 218 (1923). See generally 2 Tiffany, *Real Property*, § 425 at 209 (3rd Ed. 1939).

The reference in the deed of October 18, 1963, to the establishment of the estate in joint tenancy by the deed of February 27, 1945, and in the option clause already quoted, for giving notice to "said joint tenants, or the survivor," would not be sufficient to recreate a joint tenancy which had already terminated as a matter of law by the execution by Evelyn of the lease of January 8, 1962. This could only be done by an affirmative act of the parties pursuant to Code (1957), Art. 50, § 9 (1968 Repl. Vol.). Nor was the subsequent lease of September 15, 1962, by Helen and Evelyn *and their respective husbands* to the Loys effective to reestablish the terminated joint tenancy as the joint tenants had become tenants in common and the lease of September 15, 1962, is entirely consistent with a tenancy in common and does not specifically purport to seek to re-establish a joint tenancy.

It is also well established that the rights of dower or curtesy of spouses do not attach to a joint tenancy as there is no estate of inheritance in the respective joint tenants. Code (1957), Art.

45, § 6; See *Williams v. Dovell, supra,* 202 Md. at 358, 96 A. 2d at 488, and *Chew v. Chew, supra,* 1 Md. at 172. See also 2 *American Law of Property,* § 6.2 at 11.

Evelyn was entirely correct in executing the lease of January 8, 1962, to Mehrl without the joinder of her husband, but, as we have indicated, this resulted in a severance of the joint tenancy. It is interesting to note that every conveyance, lease or contract executed after January 8, 1962, was executed not only by Helen and Evelyn, but *also by their respective spouses.* Whether this was a matter of abundant caution by the draftsmen of these subsequent instruments or possibly indicated a realization of the change in the nature of the estate to a tenancy in common does not appear from the record, but, in any event, the method of execution of all subsequent conveyances, leases and contracts is consistent with the existence of a tenancy in common in the land by the two sisters.

The appellee, Mehrl, also argued that even if the execution of the lease of January 8, 1962, by Evelyn did not, in itself, effect a severance of the joint tenancy as a matter of law, it, together with the subsequent transactions taken as a whole, indicated an intention to sever the joint tenancy and establish a tenancy in common. In view of our opinion that the execution of the lease of January 8, 1962, did effect a severance of the joint estate as a matter of law, it is not necessary for us to pass upon this interesting question.

> *Decree of July 11, 1968 affirmed, one-half of the costs to be paid by the appellant and the remaining one-half of the costs to be paid by the appellee.*